## JAMES NICHOLS *v.* JOHN MUDGETT.

### *Illegal Contract.*

The defendant being indebted to the plaintiff, who was a candidate for the office of town representative, the parties agreed that the former should use his influence for the plaintiff's election, and do what he could for that purpose, and that if the plaintiff was elected, that should be a satisfaction of the plaintiff's claim. Nothing was specifically said about the defendant's voting for the plaintiff, but he did vote for him, and would not have done so, nor favored his election, but for this agreement. The plaintiff was elected. No actual discharge of the debt was given by the plaintiff after the election. *Held,* that this agreement was entirely void, and constituted no bar to the plaintiff's recovery of his debt.

It is not necessary to the invalidity of such an agreement that it should be secret, or stipulated to be kept secret.

If for money or other personal profit a voter agree to exert his influence in an election against what he believes to be for the public good, the agreement is void, even though, in the exercise of such influence, he resorts to no unlawful means.

BOOK ACCOUNT. The auditor found that the account presented by the plaintiff against the defendant, amounting to one hundred and sixty-five dollars and forty-seven cents, was correct, and that the plaintiff was entitled to recover that sum unless his claim was in law satisfied by the following facts:

In 1854 the plaintiff was a candidate for the office of town representative in Westford, where both the parties resided. While such candidate, and a short time before the election, there being another candidate for such office, the plaintiff solicited the defendant to use his influence in favor of the plaintiff's election. The defendant replied, in substance, that he had generally voted for the candidate of the opposite party to that to which the plaintiff belonged, and that he had a little choice in the candidates. The defendant then said to the plaintiff that he, the defendant, was owing him an unsettled account, and proposed to the plaintiff to pass receipts, and that then they would talk about a bargain; the plaintiff made some evasive reply, and said "no matter about the account, let the account go," and again requested him to use his influence for the plaintiff's election. The defendant again alluded to the account, saying he ought to pay the

account, but that he was poor, or words to that effect, to which the plaintiff, in substance replied, that he cared nothing about the account any way, that it was of no consequence. The result of the whole conversation was that it was mutually understood that the defendant should go on and use his influence in favor of the plaintiff's election to said office, and do what he could for that purpose, and that if the plaintiff was elected, the accounts between the parties should be square or even, or, in effect, that that should be a satisfaction of the plaintiff's claim, referring to the claim now in suit. Thereupon on that occasion the plaintiff handed to the defendant ten dollars, and told him to use it to the best advantage, but gave him no further directions what to do with it, except that he named one man, who, he said, belonged to his party, and was friendly to his election, but for several years had refused to attend the election unless he was paid a dollar, and the plaintiff told the defendant to give him a dollar. At this time the defendant was poor, and the plaintiff did not consider the account against him of much value. The defendant did go on and use his influence from that time in favor of the election of the plaintiff as such town representative until after the election, and did what he could for that purpose. Nothing was said between the parties about the defendant's voting for the plaintiff, except what is to be inferred from what is already stated, but the defendant did at such election vote for the plaintiff for such office, and would not have done so, or favored his election, but for the arrangement and understanding between the parties above stated.

The evidence on the part of the defendant tended to show that on the afternoon or evening of the election, and after the plaintiff was elected, the defendant met the plaintiff and asked him how business stood, and that the plaintiff replied, " all right, your books are balanced and we are all square ;" but the evidence on the part of the plaintiff contradicted this, and the auditor reported that there was no such balance of proof, as to this, to warrant him in finding that any such conversation took place.

Upon these facts the county court, at the September Term, 1859,—BENNETT, J., presiding,—rendered judgment for the plaintiff for the amount of his account, to which the defendant excepted.

*Wm. G. Shaw* and *L. F. Wilbur*, for the defendant.

*J. French* and *L. E. Chittenden*, for the plaintiff.

ALDIS, J.    The auditor's report states the following facts:

The defendant owed the plaintiff about one hundred and fifty dollars. The plaintiff, in September, 1854, was a candidate for town representative of Westford. The defendant had usually voted for the party opposed to the plaintiff. They made this agreement: the defendant should use his influence for the plaintiff's election, and do what he could for that purpose, and if the plaintiff was elected, that should be a satisfaction of the debt which the defendant owed the plaintiff. Nothing was said about the defendant's voting for the plaintiff except what may be inferred from what is above stated; but he did vote for him, and would not have done so and would not have favored his election, but for the agreement.

I. It is urged by the defendant that the court cannot presume from the above statement that the agreement was that he should vote for the plaintiff, because it is not *expressly* found. In construing the reports of auditors we are to give them a reasonable interpretation, and are to presume or find all facts which reasonably, directly and naturally flow from the facts stated. The defendant agreed " to do what he could for the plaintiff's election." He was a voter and *could* vote for him, and clearly that was what the agreement bound him to do. Any other construction of the report would be absurd. It was, therefore, an agreement for the sale of his vote.

It is not claimed but that such an agreement is immoral and void. It is only claimed that they did not in express words *say* that the defendant should vote for the plaintiff. Although nothhing was said about the defendant's vote, yet the meaning was unmistakable. Men who enter into corrupt bargains are not to be expected to speak out in plain language the name of the criminal act which they are about to commit. The consciousness of guilt and the deformity of naked crime lead men to cover up foul deeds with fair words and vague expressions. They do not seem so bad to themselves as they would if they spoke of their crimi-

nal acts in the outright plain language of honesty and of the law.

II. The bargain was not only the sale of the defendant's vote, but also of his influence and exertions against his convictions and opinions. The defendant generally voted for the candidate of the other party, and but for this agreement, would not have voted for the plaintiff nor favored his election. This also was immoral and against public policy. Every voter is bound to use his influence to promote the public good according to his own honest opinions and convictions of duty. If for money or other personal profit, he agrees to exert his influence against what he believes to be for the public good, he is corrupt, and the agreement void, even though in the actual exercise of his influence against his conscience he resorts to no unlawful means. Such bargains cannot be enforced in law. ˙ And the reason why they cannot be enforced is, not merely because they are made criminal acts by statute, or are opposed to the provisions of the constitution, but because of their own inherent turpitude, because they are corrupt and corrupting, because they are destructive to public virtue and the welfare of the community. In republican governments especially, whatever tends to destroy the purity of elections should be guarded against with the strictest watchfulness, and pursued with the most prompt condemnation by courts and legislators.

The agreement in this case seems to combine many of the worst elements of political corruption. It was for pecuniary profit. It was for the sale of his own vote. It was for the sale of his influence against his convictions of duty. His pay was made to depend on the result of the election, thus stimulating him to activity and fraud by a pecuniary interest in the result.

III. It is objected that the parties did not agree to keep it secret, and that secrecy is one badge of corruption, and it is sought to bring this within that class of cases in which agents are employed before legislative bodies to further private acts of incorporation, and in which attorneys openly known are allowed, but in which the secrecy of the agency is held to be conclusive proof of the illegality of the agreement. But this is not of that class. The most frank avowal of this trade could not have made it lawful. Unquestionably secrecy was indispensable to success,

Nichols *v.* Mudgett.

and no express agreement therefor need be proved, but it ought to be and will be presumed as the natural consequence of the agreement.

There can be no doubt that such a contract is void. For how much less than this a contract in consideration of money to promote an election would be held illegal, and under what circumstances, if any, it could be sustained we are not now called on to decide.

If men will enter into such transactions they must be sure to have their price paid them in hand. It may tend somewhat to check corruption that such matters cannot safely rest in promises or be enforced by law, but that at least the unscrupulous politician must advance the pay to the venal voter.

In the case of *Lord Howden* v. *Simpson*, 10 Adol. and Ellis 793, it was held that no agreement was alleged in the plea that the plaintiff's vote should be given or withheld upon the bill, and that he was left free to exercise his judgment and vote according to his conscience. Ch. J. TINDAL expressly says that if there had been such an averment in the plea, the deed would have been corrupt, illegal and void. But we are not prepared to assent to the remark of that eminent judge, that the tendency and effect of such a contract upon the plaintiff's vote could not be taken into consideration. The cases of *The Vauxhall Bridge Co.* v. *The Earl of Spencer*, 4 Cond. Eng. Chy. 28, and of *Edwards* v. *The Grand Junction R. R. Co.*, 7 Simons 337, and S. C. 1 Mylne & Craig 650, have no application to this case. They only show that agreements between corporations as to compensation for injury to their private interests, made to prevent opposition to acts of incorporation, are not against public policy.

IV. The contract was not an executed one. It was to depend on the result of the election. The plaintiff was not bound to discharge the debt unless elected. The discharge, therefore, after the election still remained to be done, for the contract could not execute itself.

The defendant introduced testimony tending to show that after the election the plaintiff verbally discharged the debt, but the auditor does not so find the fact.

Judgment affirmed.